Good morning, Your Honor. Don Cherez on behalf of the petitioner Dejan Radojkovic. This case is very simple. There are no dispute about any of the facts. We've candidly admitted our client, or my client, Mr. Radojkovic, told a lie on his refugee application. And I think what's most important about this case is why was he in a position to be forced to tell a white lie. The government doesn't dispute that the International Office of Migration refugee workers, you know, might have told, I shouldn't say that. Our position and our testimony was that, yes, they told us if we mentioned anything about military service or fighting during the Bosnian-Serbian conflict, we would be disqualified. That's the reason why he went along with the advice of the IOM worker. And Todd Butler from the government who testified said many of the former Serbians that he was talking to, all of them said the same thing, that they were being told when they were filling out the refugee application, don't mention your military service. But the important thing is it really wouldn't matter. Because the bottom line is, the key factor here was, did it close off a line of inquiry? And, you know, if they would have found out that my client had in fact served in the National Guard during this ethnic cleansing or ethnic war, they would have found out that, yes, he went and worked on the weekends. Yes, he was taking orders. Yes, he was a commander. I mean, not as high up as the government would like to think, but the long and short of it is, they're there doing guard duty along a road that is about 45 minutes from Srebrenica. And more importantly, this is towards the end of the war, where apparently there was a lot of fighting between the Serbian army and the Bosnian Muslim army, and I guess things were going bad for the Bosnian Muslims, and ultimately many of them started fleeing away. And so in terms of what my client did, as alleged by the government, is that he's there, some of the people that are fleeing Srebrenica end up there in the mountains and on the road near the area where they happen to be guarding, and they accept the surrender of 200 soldiers. So they call the military, they say, what do we do with these guys? And they say, grab their passports and grab their weapons and we're going to send buses over there in order to pick them up. So this is the assisted or otherwise participated aspect of what the immigration officers would have found had they questioned my client. So he accepted the surrender of 200 soldiers. How was my client supposed to know that the Serbian military would kill them a week later, if in fact that's what happened? We don't know, but we're assuming, yes, it was the Serbian military. So there was no allegation that my client or his commanders ordered that any of these soldiers be killed. My client accepted the surrender and turned them over to the military. So in that sense... There's testimony now, I think by some expert, that well, everybody in the field knew what was going on. In other words, you can infer that he knew what was going to happen to him when he did that. When he turned the surrendered people over to the next group, he knew what was going to happen. Well, Your Honor, I understand you're a former military man and that type of thing, but I don't think that everybody knew what was going to happen. Well, that's the testimony of this expert. Didn't he say that? No, that was the government's expert. Everybody should have known that, yes... I don't know, Your Honor, because I really think that if you're going to accuse somebody of being a war criminal, if you're going to accuse somebody of committing genocide, or in this particular case, ordering an extrajudicial killing, I believe that, in all fairness to my client, there needs to be a scienter. There needs to be mens rea. You need to know. We're out to get bad people. We're not out to get people that were in bad circumstances. Right, but I think the question is, if you're looking particularly at the language assisted or otherwise participated in, why isn't the government's expert's testimony sufficient? We're trying to show knowledge, and he said, well, you can infer knowledge because, and the expert testifies that it was common knowledge at the time. Your client says no. The government expert says common knowledge. Isn't the fact finder entitled to resolve that conflict? Well, and I think, but I think the issue with the immigration judge is she did not rely on that. She basically said that, you know, there is no requirement in this particular statute, since it was a new statute, that you actually have to have put a bullet inside of somebody, you know, assisted and otherwise participated is a much broader standard. And that's why we believe that, no, there is no requirement that it's fundamentally unfair, and it's a violation of due process to say that somebody should know what somebody else is going to do. But your argument, does that really go to your vagueness argument as to what participate or assist means? Yes, Your Honor. But then why isn't that resolved by the Supreme Court's decision in Broderick, in effect? In which case? In Broderick v. Oklahoma, where they were actually, you know, it's a different statute, of course. Okay. That's right. But you recall there the Supreme Court was trying to decide whether something was unconstitutionally vague when you had the phrase to take part in, and this is take part or assist in. And there the Supreme Court's question to you really is, well, doesn't that case really lead us to the same conclusion here? Well, not necessarily, because the other thing, Your Honor, is in Broderick, and I can't remember what the exact facts were there in that particular case, but I believe when you're talking about war, you know, one of the old sayings is nothing goes according to plan. And when you're talking about war, you're talking about circumstances that are totally beyond people's control. And so I see, I mean, I look at the other cases that arose in the sense of a political asylum context and the persecutor bar, and, you know, what is assisted? You know, I see the case, I think, here from the Ninth Circuit on the Cambodian individual. He's opening the door. He's letting people go into an interrogation. Even though he's dealing directly with the people, they basically say that's not participated or otherwise assisted. Then you have the individual down in Peru with the Shining Path. He serves as an interpreter. He's forced to serve as an interpreter, but they go, the interpreter's participation was sufficient participation. So I think that that's the danger of having an overly broad statute, because, you know, and of course we understand ignorance of the law is no defense, but somehow people need to be put on notice. If I do something wrong, yeah, there are consequences to that. And I believe that that's the problem here in this particular case. How is my client knowing with respect to the material misrepresentation that he knew he was doing something wrong, but as we used to say as young kids in church, but it's just a white lie. You know, when does a white lie become something more significant? And I think that both of these statutes or what happened here in these particular facts deal with that. So I don't believe that it's fair to people that are in the military field like saying, yes, I helped so-and-so or I did this or I did that. That gives too much discretion to somebody years later when a new law is passed to say what you did ten years ago was wrong. So that for me is why I think it's overbroad. That for me is why I think it's vague. It's hard to predict the future and that kind of thing. So, you know, those are, you know, the essential factors that I believe in. I mean, if you believe that my client just by being in the military or being in the National Guard, turning somebody over to the military who thereafter does something bad, and we should know that about it, you know, for me it's very hard for the private to know what the generals or the... You know, that may be true in the abstract, but then going back to the evidence that Justice Shima talked about in terms of the government expert, I mean, there are situations where, you know, a blind eye won't do you any good if generally everyone knows what is happening. You're up for this ultimate situation. So how do you — what do you — we can't discount the government's evidence. What do we do with it as a legal matter in your view? In other words, how can you overcome that evidence in some way or have us not say that it constitutes substantial evidence? Well, I mean, frankly, Your Honor, this is what I believe the government should have done. My client fully cooperated with the government. He made all of his appearances at court, seven of them when he was out of custody, and of course all of them while he was in custody. While my client was out of custody, the government expert asked my client to come to Milwaukee and to finger so-and-so as yes, he was involved with the Serbian National Guard. You know, my client fully cooperated. He went there. My client was willing to be extradited to Sarajevo to go face the War Crimes Court. We volunteered to go. But the government insisted if he's going to go, we want to deport him first and that kind of thing. And they go, well, you're putting the chicken — or the cart before the horse. Let him go. Let him face the court. Let the court decide whether he's guilty or not guilty. If he's found not guilty, he could come back. The government refused that offer. So they insisted — Oh, by the way, he's been deported since, right? Pardon? Your client has since been deported. My client was deported and since then — What happened since he was returned? He went to court and was found not guilty. Not guilty of what? Not guilty of any of the charges that are here. Well, actually, what happened is the War Crimes Court refused to hear the case. They transferred it to some other court there in Sarajevo. And he was acquitted of the charges of shooting anybody. And they didn't even mention the stuff about the surrender of the soldiers. So, in other words, because a lot of those cases fell out of — you know, they basically were dissolving the War Crimes Tribunal there and they were sending them into the local courts. But is it fair to say that he was never adjudicated on the issue here? It would be fair to say that, Your Honor. Thank you. Okay. Go ahead. Oh, I'm sorry. No, no. Let me go back to the first — I think I'll call it the first ground of the removal order was his material misrepresentation. And I think you said, well, it didn't make any difference because it didn't close off any, you know, relevant line of inquiry. But just as a matter of law, an issue of law, government seems to take the position that, well, more recent Supreme Court cases after Forbes should be read not to require that it close off a line of inquiry. Just as long as, you know, it could lead to something, that's enough. Well, I mean, to quote the same expert that you quoted earlier about my client should have known, that same expert also said — well, Todd Butler was the name of the expert — also said that it was not a material misrepresentation to not mention your military service. The only bad thing about it is we could have asked questions to say, were you present here or were you present there? So the fact that he did not mention the military service, even by the government's own expert, at least in front of the immigration court, was willing to concede that is not material. And, I mean, that's correct. You have about six minutes and a half. Do you want to reserve for rebuttal? Yes, Your Honor. Very good. Thank you. Good morning, Your Honors. Aaron Petty on behalf of the Attorney General. May it please the Court. This Court wrote in Miranda-Alvarado that guards are essential to the orderly functioning of death camps, even when they do not shoot anyone. And that's true whether the death  camp has walls and towers and barbed wire or whether it's a meadow or a warehouse or any of the other places that 8,000 men perished at Srebrenica. Dejan Radojkovic was one such guard, and then he lied about it in order to obtain refugee status in the United States. He's made two challenges to the finding that he made a material misrepresentation and three constitutional challenges to the finding that he assisted or otherwise participated in an extrajudicial killing. All of them are meritless, and the petition should be denied. First, with respect to his void for vagueness argument, void for vagueness is a doctrine that does not apply to this case for two reasons. First, because the grounds concern the characteristics that he possessed at the time of his entry, and, second, because there's no penal statute at issue here. The Supreme Court explained in a case called Butelier that the constitutional requirement of fair warning has no applicability where the Petitioner is deportable for characteristics he possessed at the time of his entry. And that's what we have here. Mr. Radojkovic possessed at the time of his entry the past that involved having participated or otherwise assisted in an extrajudicial killing. Petitioners cited another case, Jordan v. DeGeorge, that actually predates Butelier, but that case concerns facts that accrued after the individual had entered the United States. The only time that the Supreme Court has ever discussed void for vagueness in the context of immigration is where it's in the context of collateral consequences of criminal convictions that occur after entry. Secondly, the Supreme Court said in NAACP v. Button and several other cases that the void for vagueness doctrine only applies when there is a penal statute, and we don't have that here. The Supreme Court has said at least ten times that I'm aware of over more than a century, from 1893 until most recently in 2012, that removal is not a punishment. As this Court said in the case called Artikovic v. INS, it is simply a refusal by the government to harbor persons that it does not want. Removal is a civil remedy to unwind admissions or entries that should never have occurred or where the conditions of remaining have been violated. That's not to obtain retribution in response to some wrong done. And then finally, even apart from those two branches of why the void for vagueness doctrine doesn't apply here, it's simply not void for vagueness. As the Attorney General said in matter of A.H. and Justice Thomas said in his dissent in Negussie, take pardon and participate have exactly the same meaning. And as Judge McKeon said a moment ago, the Supreme Court said in Broderick v. Oklahoma that take pardon is not unconstitutionally vague. So then we're just left with the simple algebra issue of if take pardon and participate mean the same thing, and take pardon is not unconstitutionally vague, then participate isn't vague either. The Petitioner's brief also refers to the over-breath doctrine. This is a First Amendment doctrine that has no application in this case. And with respect to retroactivity, Petitioners actually conceded that Congress intended for the extrajudicial killing statute to operate retroactively, and that's perfectly acceptable. The Supreme Court said in Layman v. Carson, and this Court said in Artikovich, that retroactive immigration statutes are perfectly fine. There's also a mention of strict scrutiny in the Petitioner's brief, because this case purportedly involves a fundamental right to liberty. But strict scrutiny only applies when you have either a suspect classification, which is not at issue here, or a fundamental right, which is similarly not at issue. Aliens have no constitutional right to enter or remain in the United States, and there is no substantive due process right not to be removed. With respect to the extrajudicial killing, this hasn't appeared in Petitioner's brief, and he hasn't really raised it in this Court, and it's on the whole waived. But for sake of completeness, the statute requires that outside of the United States an alien commit, order, incite, assist, or otherwise participate under color of law of any foreign nation in a deliberated killing not authorized by a judgment of a regularly constituted court. So what did Radojkovich do? He said he secured the road from Konevich Polya to Krivika, specifically from Konevich Polya to Pervani. He was conducting sweeps and looking for people, and he found people. Two hundred people surrendered on 17 or 18 July. He facilitated their transportation. There were two days of bus traffic along that road, and the Kristich judgment from the ICTY noted that most of the prisoners at Novo Cassava were transported by bus to other locations to be executed. The Stupar judgment from one of the Bosnian courts, which is also in the record, said that guards on transport routes were a necessary part of the killing plan. And he also conducted sweeps. The government's expert witness, Butler, testified that guarding the road impacted the ability of Bosnian Muslims to escape and that the killing plan, again from the Stupar judgment, required the capture of men surrendering from the woods. All that may be true, but I think the evidence, at least, and he was not deemed noncredible, was that he didn't know about the killing plan. True? The board concluded that he either knew or should have known of the executions. Well, there's no evidence that he knew. Isn't that true? The best you have is the government expert witness who says everybody should have known. There is... Butler testified that by the morning of the 14th, the Kravica warehouse massacre was becoming common knowledge. Right. That's what we have. We have common knowledge, yes, Your Honor. Right. All I'm saying is I think we're on the same page here. I mean, you have the testimony that it was common knowledge, his testimony that he had no knowledge, and that's the state of the evidence on it. That's fair, Your Honor. Okay. You began your argument by talking about Miranda Alvarado, but in the BIA decision, there's no discussion of that case. Well, Miranda Alvarado is a persecutor bar case. It's relevant to the interpretation of the phrase assist or otherwise participate, but there are notable differences between the persecutor bar and the extrajudicial killing statute. They have very different elements. So it is unfortunate that it's not discussed because it does involve some of the same language, but it is a different statute and there's no requirement. It is a different statute, but the language is identical. And there's similar language as well in the Nazi persecutor statute. There are several of these sort of human rights provisions, and this was the board's first attempt at explaining what it found the necessary elements to be. The other question I have, and the one that probably troubles me the most, is the part of the Forbes decision is in effect incorporated into the BIA decision, to the effect that you have to have a natural tendency to influence the decision maker or DHS. So I think we all agree on that. But then the question is, it's a little odd not to cite Forbes and that second part of the test that comes out of Forbes about having a sufficient tendency to influence the decision. I'm not sure that there's sufficient inference that this disqualifying fact actually occurred. I'd like to hear from the government on what we're to do when they don't cite Forbes and the BIA decision, and the second part of the equation is left out. The second part of the test in Forbes, drawn from Justice Brennan's concurrence in Cungus, is wrong. Justice Brennan's concurrence does not represent the holding of the Supreme Court in Cungus. But even if it's wrong, it may not be wrong, but then we have to decide, can we read the BIA's decision and say it sufficiently interpreted materiality? And in doing that, it's consciously rejecting Brennan, Forbes, etc. So in other words, is this enough of a binding interpretation of materiality that we have to say this is what the BIA now says? Absolutely, Your Honor. How do we know that? I want you to have a complete answer, but fold this into your analysis. If the BIA doesn't engage in a reasoned analysis talking about Forbes or in the case of the statutory language, Miranda Alvarado, how do we know that it's engaged in something new? Well, Your Honor, the Board isn't just writing for this case and it's not just writing for this circuit when it issues a published opinion. It's writing for the nation as a whole. And so it's natural that it would cite other cases and it would engage in its own analysis. We know that it's sufficient because this is a published opinion. This is now a precedential Board decision. And the analysis that this Court would have to engage in is, first, whether materiality is a question where there's more than one reasonable interpretation. It's a standard Chevron analysis. And if it is, whether the Board's interpretation is a reasonable one. And so the question before the Court is really, I think, one of reasonability, not one of whether it cited all the right cases or not. Well, no. You cite the Third Circuit and basically adopt the language of the Third Circuit, right, in the Board's decision. So your position is they've thought about it and that's sufficient as evidenced by – I mean, I guess we don't really have any clear guidance about when they are really engaging in enough analysis to let us know have they engaged in the analysis. Well, the fact that it's published is a pretty clear indication. I mean, this is a pretty far stretch from, you know, the one-line Board decisions that the Court finds to have incomplete reasoning. And it is a reasoned decision and it's now – I mean, to the extent that it conflicts with Forbes under Brand X, the matter of DRN has now superseded it. Right. But that's – you know, this isn't – materiality wasn't the only issue in the Board's decision. And it's difficult to tell from the Board's reasoning whether they were actually thinking about that they were departing from Forbes or not or why. Well, the Board doesn't – the Board isn't required to expressly say whether it's adopting or not adopting the law of any particular circuit, even the circuit in which the case rises. No, no, no. Wait a minute. Except that you're taking the position that – I'll call it the second part of Forbes, you know, about there has to be enough evidence to support a fair inference that a disqualifying fact exists, right? That's the second part of Forbes? That's right, Your Honor. You take the position that that's no longer good law because of subsequent Supreme Court cases, right, at the very least? My position is that the subsequent Supreme Court cases indicate that Forbes was not correctly decided. Right. That's what I mean. And that matter of DR has now superseded it. It's not a good law. But if we conclude otherwise, that it is good law, then, as Chief Judge Thomas says, the Board never analyzed that second step in Forbes, right? It never considered that. So don't we have to vacate just on that basis alone? No, Your Honor. The Board is – Why? We can just reverse the Board? No, Your Honor. If we conclude that the Board is mistaken in the sense that the second part of the Forbes test is still good law in the Ninth Circuit, and the Board ignored that second part, right, never addressed it, so we can just reverse the Board, right? No, Your Honor. What shall we do? Assuming that materiality is an ambiguous term in the statute. No, no. Assuming that materiality includes the second step, namely that the government has to adduce sufficient evidence to raise a fair inference that a disqualifying fact exists. The Board never inquired into that step, right? Correct. So the Board's decision is erroneous. No, Your Honor. The Board is defining materiality under the INA as it's permitted to do, and that determination is entitled to Chevron deference. And to the extent that it conflicts with Forbes, it supersedes it under Brand X. Well, here's the problem, though. I mean, if this were a Third Circuit case, I wouldn't have any quarrel with you, but it's a Ninth Circuit case. Right. And so if the Board is saying that Forbes is incorrect and it's not dealing with it, I don't know whether the Board was actually considering Forbes or not. The Board has to – the Board takes our precedent governing the circuit, and I understand it paints on a broader canvas, and so do we. So we're confronted with the situation now. Here, do we overrule our own precedent, which we really shouldn't do as a three-judge panel, based on what a Board decision we can't necessarily interpret as squarely dealing with the issue. So we're all painting on broader canvases here. Your Honor, I would have two points in response to that. One is that as a three-judge panel, you are empowered to say that the Board has superseded prior circuit law under Chevron and Brand X. You're not overruling another panel. You're saying that the agency has given an interpretation. If we're convinced, that's what they were doing. Yes, Your Honor. And the second point would be that the Board is writing for the nation as a whole. If this were an unpublished Board decision, I might agree with you, but this is a published Board decision binding on every circuit, and there's no rule or statute or other authority that requires the Board to deal with the precedential decisions of the circuit that the case happens to arise in when it's writing for the nation as a whole. Well, except if we want the, you know, people to believe it's making sense, it's got to at least discuss, don't you think, what it's overruling? I mean, you know, it can't overrule it. It might be clearer. You're saying you're overruling it almost inferentially without even discussing it. It said nothing about the second step. Because the second step is, the second step only appears in Ninth Circuit case law, and the Board is defining materiality under the INA for the entire country. Okay. The real question comes down to this, it seems to me, is whether under Brand X this Board decision is sufficiently clear as to what it's adopting. And that leaves the question as if they don't even mention this other standard, have they actually, is this a complete reasoned decision on materiality? Absolutely, Your Honor. It adopts the definition from the opinion of the Court in Congress. Right. It's as simple as that. That's the definition the Board adopted. And it was reasonable to do so because that's what the Supreme Court has said. And I suppose if it were remanded, they would just say it again. And they would say, Ann Forbes is wrong. That would be the difference. Probably, Your Honor. And then the Supreme Court said the same thing again in Nader and said the same thing again in Wells. Right. Let me, again, because we paint on a broader canvas, when the Board has, when we've had cases like this before, the Board has always said Ninth Circuit says this and then it said now we are taking, we are issuing a precedential decision on this point. Well, this particular decision is talking about a lot of different things. Absolutely, Your Honor. Not just materiality. If it were just materiality, I could say, well, I think maybe the Board is interpreting it. But the question for us is actually is the Board engaged in the process of interpreting the statute or is it just citing stuff that it used to, from other cases? Is it, did they intend to change the law of the Ninth Circuit? And if they had cited Forbes and discussed it, I would be persuaded. But it's hard for me to know if they considered it or not by the language used. And I take your points. I'm just trying to express what our, what our concerns are. Because we're dealing with our case law and what to do with it. Absolutely, Your Honor. And it would have been perhaps clearer if the Board had cited Forbes or Forbes and Puerta or Al-Farrahan or the cases that deal with materiality in this circuit. But there's no requirement that it do so. And we know that they have thought about it. They've issued a reasoned precedential decision. And it's a reasonable interpretation. And it's now entitled to deference under Chevron and Brandeis. Let me ask you a related question along the lines of Judge Thomas's inquiry. In other words, you know, what did the Board intend to define or to overrule? For instance, you don't seem to take the position that the Board's interpretation of assist in an extrajudicial killing is entirely Chevron deference. You don't take that position, do you? That was not in the briefs because it wasn't raised by the Petitioner. Well, you think it's entirely deference? The Board's definition of assist or otherwise participate? Absolutely. Of a definition of, you know, assist in an extrajudicial. Yes, Your Honor. It would be if it weren't waived in this case. Why? Because are they an expert at extrajudicial killings? The Board is the congressionally assigned arbiter of the INA. Congress has determined that the Attorney General and the Attorney General has delegated that power to the Board, and yes. No, but the INA uses terms like felony, and we know that the Board's not an expert in defining a felony, right? And why should it be an expert at killing? The extrajudicial killing provision is an immigration-specific statute. Would you agree that the Board's definition as stated in this opinion is somewhat at odds with Miranda-Alberato? No, Your Honor. I think it's absolutely consistent with Miranda. And how so? In Miranda, this Court said that the record in Miranda was at the margins of culpability. Miranda was not in a position of authority. Radojkovic was. Miranda did not supply the physical compulsion that allowed the bad acts to occur, as do armed guards. Radojkovic did. He was an armed guard. He carried a Kalashnikov. He told people where to go. And Miranda did not forcibly or otherwise arrest the victims or bring them to the place of torture. Radojkovic did. He captured the men, and he didn't actually bring them to the place of torture, but he brought them to the bus. He facilitated their movement, and that's consistent with Miranda-Alberato. It's consistent with the Eleventh Circuit's decision in Chen from the 28J letter, where the Eleventh Circuit held that detention is often an essential predicate to performing an act of persecution. It's consistent with the Second Circuit's decision in Xi, which held that transportation to the place of persecution is assisting or otherwise participating. Miranda-Alberato also mentions that it's highly relevant whether the individual is in a position of authority, such as Radojkovic was. It's consistent with footnote 34 in Fedorenko, where the Supreme Court looked to whether the individual was wearing a uniform, armed, paid, and those sorts of things. And there's simply nothing in Miranda-Alberato that's inconsistent with these facts. Let me just switch gears slightly back to where we were talking. Do you recall whether in the briefs to the BIA either party referenced Forbes? I don't recall, Your Honor. Thank you. The briefs to the Board were very large and sometimes difficult to follow. All right. Our questions have taken over time. Any further questions from the panel? Thank you for your argument. Thank you, Your Honor. Your Honor, with respect to the briefs at the Board, I wish I knew exactly what they said, but I represented Mr. Radojkovic before the immigration judge and at all of those proceedings, I'm the one that tried to negotiate the extradition deal, et cetera, et cetera, which the government refused. After we lost the hearing, the family fired me. Of course, I was doing it pro bono, so it's one of those, well, am I happy or not happy, hired another lawyer who spent most of his time bashing the immigration judge, bashing the immigration service, and bashing me. So, and that kind of thing. So, when he lost, then we came back again here at the Ninth Circuit to really argue, was this a material misrepresentation? And I think since then, and I myself would not be opposed for a remand to the Board of Immigration Appeals. I believe since then, you know, the fact that he's been acquitted, I think that's a very, very, very relevant factor that the Board did not have to consider when it issued the original opinion. And since then, the Board has several unpublished opinions that deal exactly with these particular facts, not in this case, but with other soldiers in the unit. So it would be a good chance to give the Board an opportunity to get it right, and I would not oppose that if that's a potential option. But at any rate, I do disagree with Judge Tashima. I don't think it is fundamentally fair that people should know what the general is going to order. I mean, in times of war, I think there's a big distinction between Lieutenant William Calley at My Lai and maybe somebody else like the American sniper who may kill somebody and that type of thing. So I honestly believe we should focus on saying people who were bad actors, former Nazis, that type of thing, former people that have, you know, willfully killed and knowingly killed, there's a person who is stuck in the field under the same, stuck in the crossfire, so to speak, of what's going on between the two sides that are fighting. And I think that a national guardsman protecting a road, I don't believe that accepting the surrender and with other people in your unit and turning them over to the military, and if he was really, if he would have killed the people right there in the field, yes, then we're dealing with an extrajudicial killing. But all they're doing is following orders, and I don't want to use the Nuremberg defense, but they're following orders from the military, turning them over to the military, and in that sense, how can he, you know, have ordered an extrajudicial killing? How can he have incited, et cetera? I mean, putting somebody on a bus, letting them be killed by somebody else a week later, and for us to speculate that this is, they should know what's going to happen and that type of thing just strikes my gut as fundamentally unfair. But I believe if the court wants to remand it to the BIA, I think that they need to flesh out some of these facts in some of these later cases. Let me ask you, maybe a bad statement here, like when the battle lose the war, given the circumstances. But if we were to remand on materiality, and then the board says, well, we said what we meant, we meant what we said, in this published decision, materiality means this, and therefore we reaffirm there's a material misrepresentation, then the things you're talking about would really never come to play, correct? Well, I mean, I think if the board knows that he's found not guilty, that's, I mean, yes, they could have come up with the same decision, but they do have an unpublished decision that the facts are almost identical, other than be in order to kill somebody. Was there a material misrepresentation in that case? No, there was not. Okay. And that was just decided August 2014. So it's the same road, the same road. But isn't your remedy a motion to reopen? Pardon? Isn't your remedy a motion to reopen? I just found out about it two days ago. No, I'm not saying what you should have done right now, but, I mean, a remand on statutory interpretation may not open the doors to additional evidence, is all I'm saying. Thank you.
judges: Thomas, Tashima, McKeown